IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAN DEE INTERNATIONAL, LLC, | ) | |
| DANDEE HONG KONG HOLDINGS | ) | |
| LIMITED, and DAN DEE | ) | |
| INTERNATIONAL HOLDINGS, INC., | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| GLOBAL NEW VENTURES GROUP LC, | ) | |
| LEE CAPOZZI, and PATRICK LEE, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Dan Dee International, LLC, DanDee Hong Kong Holdings Limited, and Dan Dee International Holdings, Inc. (collectively, "Plaintiffs" or "Dan Dee") bring this action against Defendants Global New Ventures Group LC ("GNV"), Lee Capozzi, and Patrick Lee (collectively, "Defendants"), demand a trial by jury on all issues so triable, and allege as follows:

## NATURE OF THE ACTION

1.      Dan Dee brings this lawsuit to protect its highly valuable intellectual property, trade secrets, and confidential information, as well as to protect its longstanding and prized customer relationships.  Defendants—two former Dan Dee executives and a competitor—have brazenly stolen Dan Dee's copyrighted product designs, trade secrets, and other confidential information, and are using that material to solicit Dan Dee's customers in an effort to compete unfairly against Dan Dee.  Defendants are well aware that their conduct is grossly improper and unlawful.  Indeed, Defendants have implored at least one Dan Dee client to keep their poaching efforts a secret from Dan Dee.  Defendants' attempt at concealment did not work.  And Dan Dee now comes forward

to put an immediate halt to Defendants' ongoing misconduct, and to seek substantial monetary damages for the harm already inflicted by Defendants' bad faith and improper scheme.

2.      For nearly 70 years, Dan Dee has been a manufacturer of stuffed animals and other plush toys, which it sells around the globe, including to major U.S. retailers like Walmart and Meijer.  Dan Dee has invested and continues to invest significant time, money, resources, and creativity in developing and designing these consumer goods.  As a result of its long-term relationships with major retailers, Dan Dee has developed a tremendous amount of data regarding customer preferences.  Dan Dee invested significant resources to build and maintain these relationships and harness this data to help serve its customers.

3.      Dan Dee's product designs and data are protected by both copyright and trade secret law.  Its product sketches are clearly the result of a series of creative choices.  To protect its investments, Dan Dee takes affirmative steps to safeguard its confidential customer data, including by restricting access and requiring employees to execute agreements containing restrictive covenants, including non-disclosure and confidentiality obligations.

4.      Defendants Lee Capozzi and Patrick Lee agreed to such obligations in their employment agreements with Dan Dee, and Capozzi reaffirmed his obligation to protect Dan Dee's confidential information in his severance agreement.  In an egregious violation of those obligations, Capozzi and Lee orchestrated a scheme to steal Dan Dee's copyrighted designs, trade secrets, and other confidential data on their way out the door to work for a direct competitor, GNV. Defendants then used this ill-gotten material to unfairly compete against Dan Dee, shopping nearly identical products to Dan Dee's customers that are plainly based on Dan Dee's copyrights, trade secrets, and other confidential information.

5.      In fact, through an investigation, which remains ongoing, Dan Dee has uncovered concrete documentary evidence of Defendants' wrongdoing.  For example, in a June 27, 2023 email that he seemingly accidentally copied to email accounts at Dan Dee, Lee brazenly provided Walmart with a set of product sketches that he had clearly pilfered from Dan Dee.  Recognizing his misconduct, Lee wrote to Walmart, "[p]lease don't share with DD about my new role …"  On that same day, months after their departures from Dan Dee and while newly-ensconced as GNV employees, Lee emailed Capozzi a PowerPoint slide deck containing photographs of Dan Dee's stuffed animals and plush toys from the prior Valentine's Day, Easter, Halloween and Christmas seasons.  On June 29, 2023, Lee followed up with Walmart (once again seemingly mistakenly copying a Dan Dee email address) and provided sketches for GNV's upcoming Christmas merchandise that bear striking resemblance to sketches Dan Dee had previously used for its Walmart merchandise.

6.      After learning of this illicit scheme, Dan Dee confronted Defendants about their actions.  On July 17 and July 18, 2023, counsel for Dan Dee sent letters to Capozzi, Lee, and GNV regarding their improper use and dissemination of Dan Dee's confidential, proprietary information and copyrighted works (Exs. E-G).  Capozzi completely ignored Dan Dee's request for an affirmation that he would comply with the contractual covenants he continues to owe to Dan Dee, while Lee also declined to provide the requested affirmation and, in a tacit admission of his wrongdoing, offered a feeble (and not credible) claim that he was taking a "sabbatical" from his work with Defendant GNV (Ex. H).

7.      The letter to GNV included copies of Capozzi and Lee's employment agreements to put GNV on express notice of Capozzi and Lee's restrictive covenants, and included a recitation of the evidence of improper behavior on the part of these former Dan Dee employees.  GNV replied

on July 20, 2023, stating that Dan Dee's letter did "not provide sufficient factual detail to allow GNV to investigate," but nevertheless assuring Dan Dee that it had no intention of interfering with Dan Dee's protectable interests (Ex. I). This assurance lacks credibility given the weight of evidence Dan Dee has already uncovered.

8.      Absent appropriate judicial intervention, and given their track record, Defendants will assuredly continue to exploit and unfairly profit from Dan Dee's creativity, customer information, and other confidential information that Dan Dee spent decades and significant resources developing.  Unless checked, Defendants' ongoing misappropriation and utilization of Dan Dee's work will continue to cause irreparable harm to Dan Dee by, among other things: (a) impairing Dan Dee's goodwill and reputation with its customers; (b) destroying Dan Dee's customer relationships; and (c) threatening the continued disclosure, misuse, and misappropriation of Dan Dee's copyrighted, confidential, and trade secret information.  Such ongoing unlawful activity directly contravenes the goals of both the Copyright and Defend Trade Secrets Acts and would deter others from making similar creative and business investments in the future.

9.      Accordingly, Dan Dee brings this action to obtain not just compensatory and punitive damages but preliminary and permanent injunctive relief enjoining Defendants from continuing to inflict irreparable harm on Dan Dee by their wrongful and inevitable disclosure, taking, and using of Dan Dee confidential, copyrighted, trade secret, and proprietary information.

## **THE PARTIES**

10.     Plaintiff Dan Dee International, LLC is a Delaware limited liability company with its principal place of business in Los Angeles County, California.  It conducts the United States operations of Dan Dee.  Comfort Opco, LLC (now known as Dan Dee International, LLC) entered into an agreement with Defendant Lee Capozzi on February 21, 2019.

11.     Plaintiff DanDee Hong Kong Holdings Limited is a company incorporated in Hong Kong.  It conducts the Hong Kong operations of Dan Dee.  Plaintiff DanDee Hong Kong Holdings Limited entered into an employment agreement with Defendant Patrick Lee on February 1, 2020.

12.     Plaintiff Dan Dee International Holdings, Inc. is a company incorporated in Delaware.  It is the sole member of Plaintiff Dan Dee International, LLC and the indirect owner of DanDee Hong Kong Holdings Limited.  Dan Dee International Holdings, Inc. is the copyright owner of the copyrighted works (Ex. J) that are the subject of the present lawsuit.

13.     Defendant Lee Capozzi is a natural person who, upon information and belief, resides in New Jersey.  Capozzi was a Dan Dee employee until April 9, 2023, when he resigned to work for GNV.

14.     Defendant Patrick Lee is a natural person who, upon information and belief, resides in Hong Kong.  Lee was a Dan Dee employee until May 19, 2023, when he resigned to work for GNV.

15.     Defendant Global New Ventures Group LC is an Arkansas limited company, with its principal place of business in Benton County, Arkansas.

## JURISDICTION AND VENUE

16.     This Court has federal subject matter jurisdiction over this action, which involves claims arising under the Copyright Act of 1976, as amended, 17 U.S.C. *et seq.* and the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.* ("DTSA").  15 U.S.C. § 1121; 28 U.S.C. § 1331.  This Court further has subject matter jurisdiction over Plaintiffs' related state-law claims under the doctrine of supplemental jurisdiction.  28 U.S.C. § 1367.

17.     Defendant Lee Capozzi is subject to personal jurisdiction in Delaware because he entered into an employment agreement with a Delaware LLC, and in which he consented to such jurisdiction:

> **Consent to Jurisdiction**.  Each party hereto hereby agree that any claim, action or lawsuit arising out of or relating to this Agreement or any of the transactions contemplated hereby may be initiated in any federal or state court located within New Castle County in the State of Delaware, and each party hereto hereby further agrees that venue for all such matters shall lie exclusively in those courts.  Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have, including any claim of forum *non conveniens*, to venue in the courts located in New Castle County, Delaware.  Each party hereto hereby agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Ex. A, Capozzi Employment Agreement § 5.12.

18.     Defendant Patrick Lee is subject to personal jurisdiction in Delaware, as he likewise consented to such jurisdiction as part of his employment agreement:

> **Consent to Jurisdiction**.  Each party hereto hereby agree that any claim, action or lawsuit arising out of or relating to this Agreement or any of the transactions contemplated hereby may be initiated in any federal or state court located within New Castle County in the State of Delaware, and each party hereto hereby further agrees that venue for all such matters shall lie exclusively in those courts.  Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have, including any claim of forum *non conveniens*, to venue in the courts located in New Castle County, Delaware.  Each party hereto hereby agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Ex. B, Lee Employment Agreement § 5.12.

19.     Defendant GNV is subject to personal jurisdiction in Delaware because it has placed its merchandise into the stream of commerce directed at Delaware, in addition to other states across the United States.  Defendant GNV is further subject to personal jurisdiction in Delaware because its tortious actions, as alleged herein, involved interference with employment

agreements governed by Delaware law and that involved as counter-parties, directly or indirectly, Delaware LLCs.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS

## I.     DAN DEE'S BUSINESS AND THE EMPLOYMENT OF CAPOZZI AND LEE

21.     Dan Dee is a leading designer and supplier of seasonal stuffed animals, plush toys, and other décor and accessory products.  Founded in 1954, Dan Dee is known by its major retailer customers, including the likes of Walmart and Meijer, for its demonstrated ability to design and deliver fresh, innovative, and high-quality products.  Over nearly the past seven decades, Dan Dee has built relationships with its customers and suppliers across the United States and Asia, and its large designer base and relationships with factories enables it to continue to offer new and exciting products season after season.  Today, Dan Dee has over 150 designers and serves a wide customer base, including large retailers, food and drug chain stores, and specialty shops.

22.     Defendant Capozzi joined Dan Dee on or before February 21, 2019.  At the time of his resignation, Capozzi was employed by Dan Dee in the role of Senior Vice President of Design. In that capacity, Capozzi was responsible for the creation of original and innovative designs of Dan Dee's merchandise of stuffed animals and plush toys.  The creation of designs for stuffed animals and plush toys is a highly imaginative process, requiring an understanding of what features of stuffed animals and plush toys appeal to the consumer, and re-designing the merchandise to enhance the appeal, having regard to the proportions of the key features of the merchandise, the combination of colors, materials used to construct the merchandise, and the overall character portrayed by the stuffed animal or plush toy.

23.     In 2022, Capozzi's annual salary as Senior Vice President of Design was $220,000 with eligibility for an annual cash bonus at a target level to be determined by the Compensation Committee of Dan Dee of no less than 100%, but no more than 130%, of Capozzi's base salary.

24.     Defendant Lee joined Dan Dee on or before March 6, 2019.  At the time of his resignation, Lee was employed by Dan Dee in the role of Senior Vice President of Sales.  In that capacity, Lee was responsible for, among other things, planning, executing, and driving the sales and marketing strategies of Dan Dee's merchandise to its retailers.

25.     In 2022, Lee's annual salary as Senior Vice President of Sales was HK $1,000,000 with eligibility for an annual cash bonus at a target level to be determined by the Compensation Committee of Dan Dee of no less than 100%, but no more than 130%, of Lee's base salary.

## II.     LEE'S AND CAPOZZI'S EMPLOYMENT AGREEMENTS

26.     On February 21, 2019, Capozzi signed an employment agreement with Dan Dee ("Capozzi Employment Agreement," and, with the Lee Employment Agreement, the "Employment Agreements").  The Capozzi Employment Agreement is attached as Exhibit A.

27.     On March 6, 2019, Lee signed an employment agreement with Dan Dee which was subsequently amended and restated on February 1, 2020 ("Lee Employment Agreement").  The Lee Employment Agreement is attached as Exhibit B.

28.     On May 25, 2023, following notice of his resignation, Capozzi signed a separation agreement with Dan Dee (the "Separation Agreement").  The Separation Agreement is attached as Exhibit C.

### A.     Intellectual Property Ownership

29.     The Employment Agreements contain provisions setting forth Dan Dee's ownership of intellectual property developed over the course of Capozzi and Lee's employment.

30.     Specifically, Capozzi and Lee agreed that Dan Dee or its affiliates would have exclusive ownership of any such work of authorship:

> <u>Inventions</u> . . . The Executive acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, works of authorship and other work product, whether patentable or unpatentable, (A) that are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any Related Company resources and/or within the scope of the Executive's work with any Related Company and that relate to the business, operations or actual or demonstrably anticipated research or development of the Company, and that are made or conceived by the Executive, solely or jointly with others, prior to or during the Employment Period, or (B) suggested by any work that the Executive performs in connection with any Related Company while performing the Executive's duties with any Related Company shall belong exclusively to any Related Company (or its designee), whether or not patent or other applications for intellectual property protection are filed thereon (the "Inventions").

Ex. A at § 4.4(F)(i); Ex. B at § 4.4(F)(i).

31.     The Employment Agreements also contain a "Work for Hire" provision:

> In addition, the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Related Companies and the Executive agrees that the Related Companies will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to the Executive.

Ex. A at § 4.4(F)(ii); Ex. B at § 4.4(F)(ii).

**B.     <u>Restrictive Covenants</u>**

32.     To safeguard its confidential, proprietary, and trade secret information from being used for any unauthorized purpose—*i.e.*, for any purpose other than conducting Dan Dee's business—and to protect its substantial investment in its employees, Dan Dee requires its employees to agree to confidentiality, non-disclosure, and non-compete restrictions.

33.     Capozzi and Lee agreed to be bound by such obligations as a condition of their employment at Dan Dee and their receipt of Dan Dee's confidential, proprietary, and trade secret information.  The obligations of confidentiality, non-disclosure, and non-compete are contained in

the Employment Agreements.  Capozzi is bound by a similar restrictive covenant of confidentiality and non-disclosure via the Separation Agreement.

### 1.   Confidentiality and Non-Disclosure Obligations

34.   With respect to Dan Dee's confidential, proprietary, and trade secret information, Capozzi and Lee agreed that they would keep strictly confidential and would not disclose to any person or entity any "Confidential Information":

> The Executive agrees that the executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any Person, other than in the course of the Executive's assigned duties and for the benefit of any Related Company, either during the period of the Executive's employment with any Related Company or any time thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on any Related Company's part to maintain the confidentiality of such information, and to use such information only for certain limited purposes, in each case, which shall have been obtained by the Executive during the Executive's employment with any Related Company.

Ex. A at § 4.4(E)(i); Ex. B at § 4.4(E)(i).

35.   The Employment Agreements define "Confidential Information" to include, among other things, drawings and sketches that Capozzi and Lee created by virtue of their employment at Dan Dee, as well as customer lists and contact information:

> **Confidential Information** means all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, results of research and development, formulas, methods, processes, treatments, drawings, sketches, specifications, designs, plans, patterns, models, plans and strategies, price lists, sales reports and records, financial information and projections, personnel data, customer lists and contact information, lists of targeted prospective customers, supplier lists, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company or any of its affiliates, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, raw partners and/or competitors.

Ex. A at § 6; Ex. B at § 6.

36.     The Employment Agreements also require Capozzi and Lee to return any Dan Dee

property, including Confidential Information, upon their termination:

> Return of Company Property.   On the date of the Executive's termination of
> employment with any Related Company for any reason (or at any time prior thereto
> at the Company's request), the Executive shall return all property (including
> Confidential Information) belonging to the Related Companies . . . .

Ex. A at § 4.4(G); Ex. B at § 4.4(G).

37.     The Separation Agreement also includes an obligation to return Company Property

upon the termination of employment:

> Company Property.   You acknowledge and confirm that you have returned to the
> Company all keys, credit cards, computers, computer files, diskettes, database
> information, cell phones and PDAs, customer information, sales documents,
> financial documents, budgets and forecasts, and all other property and assets of the
> Company in your possession or under your control.   You further agree that to the
> extent you have any information about the Company stored or retained on any
> personal computer or other storage device, you will take reasonable good faith
> measures to delete said information from your computer or storage device, but only
> after first returning a copy of said information to the Company.

Ex. C at § 2.

**2.     Customer Non-Solicitation Obligations**

38.     Capozzi and Lee also agreed not to solicit Dan Dee's customers per the following

obligation:

> Business Relation Non-Solicit.   During the course of the Executive's employment
> with any Related Company, the Executive shall not, directly or indirectly through
> another Person . . . induce or attempt to induce any customer, supplier, licensee,
> licensor or other business relation of a Related Company to cease doing business
> with a Related Company, or in any way interfere with the relationship between any
> such customer, supplier, licensor or other business relation and a Related
> Company . . . .

Ex. A at § 4.4(C); Ex. B at § 4.4(C).

### 3.      Non-Compete Obligations

39.     Capozzi and Lee further agreed that they would not compete with Dan Dee during

their employment:

> <u>Restricted Activities</u> . . . during the course of the Executive's employment . . .   the
> Executive shall not . . . manage, control, operate, consult with, render services for . . . any
> business that competes with or otherwise engages in any aspect of the Business in any
> geographic area in the world in which the Related Companies conduct their Business,
> including the United States, Hong Kong, and China.

Ex. A at § 4.4(C); Ex. B at § 4.4(C).

### 4.      The Covenants Are Reasonable

40.     The foregoing covenants in the Employment Agreements are reasonable and

tailored to protect Dan Dee's legitimate interests including, but not limited to, its copyrighted

works, trade secrets, confidential customer information, customer goodwill, and its investment in

its employees.

41.     Dan Dee expended substantial time, energy, money, and ingenuity in creating and

improving its drawings, sketches, specifications, designs, plans, patterns, models, plans and

strategies, price lists, sales reports and records, financial information and projections, personnel

data, customer lists and contact information, lists of targeted prospective customers, and supplier

lists.

42.     Because the retail industry is a competitive industry, information pertaining to Dan

Dee's trade secrets, inventions (whether or not patentable or reduced to practice), innovations,

improvements, know-how, developments, techniques, results of research and development,

formulas, methods, processes, treatments, drawings, sketches, specifications, designs, plans,

patterns, models, plans and strategies, price lists, sales reports and records, financial information

and projections, personnel data, customer lists and contact information, lists of targeted

12

prospective customers, and supplier lists are confidential and proprietary information, deserving trade-secret protection. Dan Dee developed and marketed an extremely successful stuffed animals and plush toys business that is highly dependent upon the innovativeness, inventiveness, and originality of its merchandise, and maintaining the secrecy of the sketches and drawings of such designs.

43.     In addition, Dan Dee also devotes substantial resources to the recruitment, training, mentoring, and compensation of its employees so that they can perform the necessary services for customers as well as develop and nurture the close relationships necessary to keep customers satisfied. The restrictive covenants that prohibit the direct or indirect solicitation of Dan Dee employees are reasonable and narrowly tailored to protect Dan Dee's legitimate interests in its investment in its employees and maintaining the stability of its workforce.

## III.     DAN DEE'S POLICIES PROTECTING ITS CONFIDENTIAL INFORMATION

44.     Dan Dee takes seriously the protection of its confidential and trade secret information, including the security of its proprietary customer information.

45.     The non-disclosure of confidential customer information is vitally important to Dan Dee, and Dan Dee would be seriously harmed by the unauthorized disclosure of its proprietary, confidential information.

46.     In addition to requiring that employees agree to confidentiality and non-disclosure provisions, Dan Dee has implemented significant controls to safeguard and secure its information.

47.     For example, Dan Dee's computer systems are all password-protected. Once an employee accesses Dan Dee's computer systems with unique credentials, the employee has access only to the information that the employee needs to perform his or her duties on behalf of Dan Dee.

48.     To further safeguard its data, information systems, and consumer and employee information, Dan Dee's Employee Handbook also addresses safeguarding confidential information, including through the below provisions:

- **Conduct Expectations**:  "Although it is impractical to provide a complete list of types of conduct that could result in disciplinary action, examples of these types of infractions include, but are not limited to . . . [u]nauthorized disclosure of trade secrets, confidential information or misusing privileged information."

- **Confidentiality**:  "The protection of confidential business information is critical to the success of the worksite employer.  Information about the worksite employer, its clients or employees should not be divulged to anyone other than persons who have a right to know or are authorized to receive such information.  When in doubt as to whether certain information is or is not confidential, employees must first clearly establish that appropriate management personnel have authorized such disclosure.  This policy in handling of confidential information extends to both external and internal disclosure.  Employees are not permitted to use confidential information obtained as a result of employment with the worksite employer (whether still employed or not) for the purpose of furthering any private interest, or as a means of making personal gains.  Use or disclosure of such information can result in civil or criminal penalties."

- **Electronic Media Policy**:  "Electronic media and services are business tools for employees to use during the work day. They include Internet/Intranet/Extranet related systems, computer equipment, software, operating systems, storage media, network accounts providing electronic mail, World Wide Web browsing and File Transfer Protocol (FTP).  Employees are expected to use these resources for business related purposes only (e.g., to communicate with customers, to research relevant topics and obtain useful business information, etc.).  It is important that employees conduct themselves appropriately while using these resources, and respect the copyrights, software licensing rules, property rights and privacy of others, just as they would in any other business dealings.  All existing company policies apply to employee conduct while using these resources, especially those that deal with privacy, misuse of company resources, sexual harassment and confidentiality.  Employees are expected to exhibit the same high level of ethical and business standards when using technology as they do with more traditional workplace communication resources."

- **Electronic Media Policy – General**:   "Do not disclose any confidential, sensitive or proprietary company information. . . . Employees are responsible for protecting their own passwords and may not reveal their passwords to others or allow use of their account to others."

- **Electronic Media Policy – Internet**:  "The transfer of company information to a non company Internet email account is prohibited."

*See* Ex. D.

49.     These measures—restrictive covenants, Dan Dee's detailed employee handbook, and password protection—are some of the significant and thorough steps Dan Dee takes to protect its trade secret and confidential information.

## IV.   CAPOZZI AND LEE BREACH THEIR CONTRACTUAL OBLIGATIONS TO DAN DEE

50.     Starting during their employment at Dan Dee, and continuing after they left Dan Dee to join GNV, Capozzi and Lee misappropriated Dan Dee's confidential information and trade secrets, including by accessing, copying, and transferring to GNV detailed sketches and drawings of Dan Dee's designs of stuffed animals and plush toys for Dan Dee's upcoming Halloween and Christmas seasons, which it intended to manufacture and supply to Walmart and Meijer, as well as proprietary Dan Dee information, including factory costs, retail pricing, packaging and sales budgets relating to its merchandise for Walmart, Meijer, and other Dan Dee customers.

51.     GNV knew that Capozzi and Lee were senior executives of Dan Dee, occupying the positions of Senior VP of Design and Senior VP of Sales, respectively, and held long-standing relationships with heavy-hitting retailers such as Walmart and Meijer, such that Capozzi and Lee could significantly contribute to GNV's business if the innovation and originality of the Dan Dee merchandise could be utilized by GNV.  Upon information and belief, GNV communicated with Capozzi and Lee via their personal email addresses to deliberately conceal Defendants' knowingly wrongful misconduct.

52.     GNV was also aware of, or reasonably should have been aware of, Capozzi and Lee's restrictive covenants and legal obligations owed to Dan Dee, given the industry practice in the highly competitive retail industry of stuffed animals and plush toys of restrictive covenants to protect the innovation and originality of such designs.

15

53.    Defendants' ongoing and improper misappropriation of Dan Dee's confidential and trade secret information has caused, is continuing to cause, and threatens to cause, irreparable harm to Dan Dee by, among other things, (a) impairing Dan Dee's goodwill and reputation with its retail customers, such as Walmart and Meijer, and referral sources; and (b) threatening the continued disclosure, misuse, and misappropriation of Dan Dee's confidential and trade secret information, including the innovation and originality of Dan Dee' merchandise, as represented in the misappropriated drawings and sketches.

**A.    Defendant Capozzi**

54.    On October 26, 2022, Laya Iliria ("Iliara") of GNV scheduled a Zoom meeting with Capozzi.  In a deliberate attempt to conceal GNV and Capozzi's wrongful conduct, the Zoom invitation was sent from Iliria's GNV email address to Capozzi's personal email address, at Capozzi_lee@yahoo.com, rather than Capozzi's email address at Dan Dee.  The subject of the Zoom meeting was "Lee and Laya intro."  Upon information and belief, Capozzi and Iliria discussed during this Zoom meeting setting in motion their deliberate, calculated, and deceitful scheme to misappropriate drawings and sketches that belonged to Dan Dee.

55.    On November 16, 2022, Capozzi received an email from a Senior Merchant at Dan Dee, attaching a document entitled, "2024 WALMART EASTER UPDATES-REVISIONS NEEDED.pdf" ("Dan Dee Sketches").  In that email, Capozzi was asked to update the new sketches pertaining to merchandise that Dan Dee proposed to supply to Walmart for the upcoming Easter season.  The Dan Dee Sketches included a donut, fox, and raccoon (circled in red):





56.     Dan Dee is the copyright owner of the donut, fox, and raccoon depicted in the above sketches, which Dan Dee has registered with the U.S. Copyright Office under the following content titles:

a.     "Easter Bunny Donut"



b.     "Easter Fox"



c.     "Easter Raccoon"



57.     The donut, fox, and raccoon are strikingly identical to sketches that Lee, following his departure from Dan Dee to work for GNV, would later send to Walmart on June 29, 2023, as further alleged below, passing them off as belonging to GNV.  Upon information and belief,

Capozzi and Lee misappropriated the Dan Dee Sketches to GNV for the purpose of benefiting GNV to the detriment of Dan Dee.

**B.**     **Defendant Lee**

58.     On December 6, 2022, Lee caused a parcel of stuffed animals and plush toys to be shipped, via FedEx, from Hong Kong to Iliria of GNV, at an address in Connecticut.  In a clumsy attempt to conceal the identity of the sender, Lee instructed FedEx to issue the commercial invoice to "Patrick Lew," a pseudonym for his real name, Patrick Lee.

59.     Lee was assisted by non-party Tracy Tse ("Tse"), then a Dan Dee employee, in shipping the parcel of stuffed animals and plush toys to GNV.  On December 6, 2022, a FedEx employee wrote to Tse and attached an airbill for the secret shipment to GNV, noting that further information was required for the shipment to clear customs.  The airbill, attached to the email to Tse, was addressed to Iliria and noted that the shipment was from "Patrick Lew," and described the items as "Stuffed Toys."

60.     On December 7, 2022, Tse replied to the FedEx employee.  In that response, Tse provided the required "consignee email address" as Iliria's email address at GNV.  Tse also attached to the email a spreadsheet of the contents of the shipment ("FedEx Spreadsheet"):

| ATTN: | LAYA ILIRIA | | | | DATE: | 12/5/2022 |
|---|---|---|---|---|---|---|
| CTN | ITEM NO | DESCRIPTION | HTS# | QTY (pcs) | PRICE (US$) | AMOUNT (US$) |
| FOR : | SAMPLE OF STUFFED TOY | | | | | |
| 1A | 224-195 | VAL HEART TEDDY PLUSH | 9503.0000.73 | 2 | US$3.90 | US$7.80 |
| | 224-195 | VAL SOFT TEDDY PLUSH | 9503.0000.73 | 3 | US$3.80 | US$11.40 |
| | 222-212 | VAL JUNGLE ANIMALS PLUSH | 9503.0000.73 | 4 | US$3.50 | US$14.00 |
| | 222-211 | VAL ANIMALS PLUSH | 9503.0000.73 | 4 | US$3.80 | US$15.20 |
| 2A | 223-245 | VAL JUMBO FLOPPY PLUSH | 9503.0000.73 | 2 | US$7.50 | US$15.00 |
| | 228-167 | VAL M JUNGLE ANIMALS PLUSH | 9503.0000.73 | 5 | US$2.70 | US$13.50 |
| | 218-010 | VALTEDDY PLUSH | 9503.0000.73 | 4 | US$2.50 | US$10.00 |
| | 213-176 | VAL SITTING PUPPY PLUSH | 9503.0000.73 | 4 | US$2.80 | US$11.20 |
| 3A | 223-245 | VAL JUMBO FLOPPY PLUSH | 9503.0000.73 | 2 | US$7.50 | US$15.00 |
| | 223-243 | VAL SEE ANIMALS PLUSH | 9503.0000.73 | 4 | US$3.70 | US$14.80 |
| 4A | 208-046 | VAL JUMBO UNICORN PLUSH | 9503.0000.73 | 1 | US$8.60 | US$8.60 |
| | 224-199 | VAL CLASSIC TEDDY PLUSH | 9503.0000.73 | 3 | US$3.80 | US$11.40 |
| | 222-207 | VAL L JUNGLE PLUSH | 9503.0000.73 | 4 | US$3.80 | US$15.20 |
| 5A | 223-234 | VAL SITTING PUPPY PLUSH | 9503.0000.73 | 4 | US$3.90 | US$15.60 |
| | 223-222 | VAL PUPPY PLUSH | 9503.0000.73 | 8 | US$3.70 | US$29.60 |

61.     On February 21, 2023, Lee sent an email from his Dan Dee email address to Erica Pang, Assistant Merchandising Managing of Li & Fung, a supply chain logistics company used by Dan Dee, and blind copied (bcc'd) his own personal email address, patricklee1@netivator.com. In an earlier email in the same chain, Ms. Pang had informed Lee that she was resigning from Li & Fung, and provided the contact details for her replacements.  Thus, by later blind copying his personal email address, Lee was able to transmit the contact details for these replacement employees to himself outside of Dan Dee's systems.  The obvious implication is that Lee was anticipating using the supply chain services of Li & Fung outside of Dan Dee—*i.e.*, as part of Capozzi and Lee's plan to transition over to GNV and utilize the misappropriated trade secrets of Dan Dee for the benefit of GNV.

62.     Also on February 21, 2023, Lee forwarded to his personal email another Dan Dee email chain regarding Li & Fung's services.  That email included as an attachment a Dan Dee proprietary spreadsheet entitled, "Walmart_2024_Valentines_Day_Recycled_Plush.xlsx"

("Valentine's Day Spreadsheet").  The Valentine's Day Spreadsheet contained sample case identification numbers, program year, season, item descriptions, target factory costs for ten to twenty thousand units and for fifty to one hundred thousand units, FOB Targets, retail pricing, and sample photos of Dan Dee stuffed animals and plush toys for the upcoming Valentine's Day holiday for Walmart.

63.     On March 21, 2023, in yet more egregious conduct, Lee shipped to Capozzi a box of Dan Dee plush toys.  The note on the pro-forma invoice issued by the shipping company, DHL, indicated that it was a "Personal Gift" from Lee to Capozzi.  Upon information and belief, the sample of plush toys that Lee shipped to Capozzi was meant to supply a blueprint for further merchandise that Capozzi and Lee would use for the benefit of GNV and to the detriment of Dan Dee.

64.     On or about June 14, 2023, as Lee later recorded in an email to Iliria and Capozzi, Lee met with the Sourcing Director (Hong Kong and Singapore) of long-time Dan Dee customer, Meijer.  During that dinner meeting, Lee discussed with the Meijer Sourcing Director opportunities for GNV to supply Meijer with stuffed animals and plush toys.  Lee also informed the Meijer Sourcing Director that Lee had access to a designer with over 30 years of experience (*i.e.*, Capozzi).

65.     A short time later, Lee reported to Capozzi, on June 27, 2023, that his efforts were successful and that the Meijer Sourcing Director had agreed to partner with GNV to supply Meijer merchandise for the Halloween season.  In that email, which was copied to Iliria, Lee attached a series of sketches that he brazenly admitted had been pilfered from Dan Dee:



66.     Dan Dee is the copyright owner of the following works depicted in the above sketches, which Dan Dee has registered with the U.S. Copyright Office under the following content titles:

    a.     "Halloween Bunny Heavenly Soft"



    b.     "Halloween Masked Unicorn"



c.   "Halloween Pumpkin Dog"



d.   "Halloween Witch Cat"



67.   The sketches match the descriptions of stuffed animals and plush toys in the Fedex Spreadsheet that Lee had covertly shipped to Iliria in December 2022.  The unicorns match the description "Val Jumbo Unicorn Plush."  The teddy bears match the descriptions "Val Heart Teddy Plush," "Val Soft Teddy Plush, "Val Teddy Plush, and "Val Classic Teddy Plush."  The puppies match the descriptions "Val Sitting Puppy Plush" and "Val Puppy Plush."

68.   Later on June 27, 2023, Lee emailed Capozzi a PowerPoint slide deck entitled, "Meijer AG promotion (DD) orders.pptx" ("Dan Dee Slide Deck").  That slide deck included photographs of stuffed animals and plush toys supplied by Dan Dee from the prior Easter, Halloween and Christmas seasons, and included commercially sensitive and proprietary information about Dan Dee's pricing and sales volumes:

**2021 – Halloween AG promotion**

**DESCRIPTION:** MJR HWN AG PROMO PLUSH 9" 4 ASRT
**ASSORTMENT:** 4 ASRT
**UPC:** 713733319485

**PACKING:** EA.W/HANG TAG + J-HOOK; 32 PCS/PB/CTN

**FOB:** USD$2.05                                    **RETAIL:** USD5.99
**STORE COST/ELC:**                                 **MARGIN:**
**TOTAL QTY:** 28,512
**TOTAL CARTON QTY:** 891

---

**2020 – Christmas AG promotion**



KX048239MES   03/13U

**DESCRIPTION:** MJR CHRISTMAS AG PROMO 8"H 4 ASRT
**ASSORTMENT:** 4 ASSTD

**PACKING:** EA.W/HANG TAG & J-HOOK
32PCS/PB/CTN

| | | | | | | |
|---|---|---|---|---|---|---|
| **CUBE:** | 2.2620 | **N.W:** | | | **G.W:** | |
| **FOB:** | 2.0500 | **ELC:** | $0.0000 | | **RETAIL:** | $5.99, |
| **TOTAL QTY:** | 40,000 | | | | | |

69.    On June 29, 2023, Lee contacted a Walmart employee responsible for sourcing products, and attached sketches of stuffed animals and plush toys that originated with Dan Dee. In that email, Lee reported to Walmart that, "[w]e already started 2024 Halloween and Christmas development . . . Wish to work with you, Itzel, Lidya and Mariana again . . .."  The designs that Lee sent to Walmart are shown below:



70.     The above sketches attached to Lee's email included drawings for a donut (the "GNV donut sketch"), raccoon (the "GNV raccoon sketch"), and fox (the "GNV fox sketch"), (collectively the "GNV sketches"), and are excerpted and pictured below:

  

71.     The GNV Sketches are virtually identical to the donut, fox, and raccoon that Capozzi worked on, and created, as shown in the Dan Dee Sketches.  The following comparison shows the striking similarities between the Dan Dee Sketches and the GNV Sketches:



72.     When comparing the sketches of the two donut plush toys, it is readily apparent that both sketches feature a nude-colored donut with white frosting and seasonal holiday ears.



73.     The white frosting has a creative scalloped edge and is confined to the interior portion of the light-brown donut.  Oblong-colored sprinkles appear atop the white frosting of the donut.  The donut features a small donut hole in the center of the donut.  The frosting does not extend completely to the center hole of the donut.  Instead, a portion of the plain donut beneath the frosting is visible in the center of the donut.  Directly above the center hole is a face for the donut. The face in both sketches is happy and includes two round black eyes and a smiling black mouth.

All of the features were creative choices made by Dan Dee that set its donut plush toy apart from other donut plush toys on the market.  Indeed, a Google search reveals that no other donut plush toy design combines all of the aforementioned features into one stuffed toy like the Defendants' infringing sketch.  A copy of Google search results for "donut plush toys" conducted on November 8, 2023, is attached hereto as Exhibit K.

74.     The slight differences between these two sketches are largely attributable to the seasons for which each plush was designed.  Dan Dee's donut plush toy was submitted for Easter.  Thus, its donut sketch features pastel-colored sprinkles and bunny ears comprised of a white outer ear and pink inner ear.  The mouth of the donut also appears to be open in the Dan Dee sketch.  This differs slightly from GNV's donut sketch which, per Lee's email, was designed for Christmas, and thus features red and green sprinkles and red reindeer ears.

75.     A comparison of the two raccoon sketches likewise reveals wholesale copying:



76.     Here, once again, the similarities between the two pieces are striking.  Immediately noticeable in both sketches is the colored ribbon that features a plaid design tied in a bow at the neck of the raccoon.  Both raccoons have upright ears with a black exterior and white interior.  The

face of the raccoon is round with eyes with black pupils surrounded by a small ring of white sclera. The immediate area surrounding the eyes is black. Flush above the black portion surrounding the eyes is a white stripe at a descending angle. Below the eyes, the black design surrounding them ends halfway down the snout of the raccoon. The snout of the raccoon is circular. Its nose is an upside-down triangle. Its mouth appears to be smiling in a narrow squiggle that looks like a wide lowercase "w." The raccoon's face and body are lighter in shading and coloration than its ears or the darker area surrounding the eyes. The arms of the raccoon feature a line of demarcation that separates the arms from the paws of the raccoon. The arms of the raccoon are darker than the paws. The raccoon has a black and white tail that is visible to the left of its body. Indeed, a Google search reveals that no other raccoon plush toy design combines all of the aforementioned features into one stuffed toy like the defendants' infringing sketch. A copy of Google search results for "raccoon plush toys," "raccoon plush toy with ribbon," and "raccoon plush toy with plaid ribbon" are attached hereto as Ex. L.

77.     Finally, when comparing the sketches of the two foxes, similarities like those described above are evident between the two sketches.




78.    Both sketches depict a fox wearing a uniquely plaid ribbon, with a further striking similarity of the lower half of the face being white.  The outer ears, paws, and feet of the fox are black.  The inner ears of the fox are white.  The fox has a rounded face, and the top half of its face is the same reddish-brown color as the rest of its body, while the bottom half of the face is white. The fox has an oblong face shape with black pupils surrounded by a small ring of white sclera.  It has a round body with a two-toned tail that is reddish-brown with a white tip. The snout of the fox is circular.  Its nose is an upside-down triangle.  Its mouth appears to be smiling and is a narrow squiggle that looks like a wide lowercase "w."

79.    Tellingly, the Google search results referenced above reveal that there are several ways to depict all the above plush plush toys, but no other plush toy on the market combines all of the above-mentioned elements for any given plush into one toy. In short, aside from Dan Dee's designs, a plush toy with the same combination of features like the ones depicted in the GNV sketches *does not exist*.  This further supports Dan Dee's belief that GNV copied its copyrighted designs.

80.    Dan Dee learned about this infringement in or around June 2023.  Upon learning of the infringement, Dan Dee notified Defendants that their actions infringed on Dan Dee's copyrights and demanded that Defendants cease and desist from their infringing actions, in violation of both the Employment Agreements and the Separation Agreement.  A true and correct copy of the letters that Dan Dee sent to Defendants are attached hereto as Exhibits E-G.

81.    After Dan Dee wrote to Defendants asking them to cease and desist from their unlawful conduct, counsel for Lee responded in a letter agreeing to "observe" the restrictions set forth in his Employment Agreement, which required that Lee refrain from, among other things,

infringing on Dan Dee's copyrights.  A copy of the letter that counsel for Lee sent to Dan Dee is attached hereto as Exhibit H.

82.     Capozzi never responded.

83.     Counsel for GNV responded in a letter that purported to provide "assurances" that it did "not intend to take any action that would violate Dan Dee's protectable interests."  A copy of the letter that counsel for GNV sent to Dan Dee is attached hereto as Exhibit I.

84.     None of the Defendants provided the specific, basic assurances sought by Dan Dee, forcing Dan Dee to bring this lawsuit.

**The Harm to Dan Dee**

85.     As discussed above, Dan Dee produces seasonal plush toy designs which it sells to major retailers for a profit.  Defendants' willful infringement unfairly deprives Dan Dee of this revenue and will continue to do so unless enjoined.  Specifically, Defendants' creation of nearly identical knock off plush toy designs (a) allows Defendants to profit commercially without investing the time, resources, and creativity that Dan Dee has in developing these designs, thereby undermining Dan Dee's willingness to create new plush toy designs; (b) takes sales away from Dan Dee; and (c) devalues and causes substantial harm to the value of Dan Dee's plush toy designs.  Furthermore, Defendants' copying of Dan Dee's copyrighted designs means that Dan Dee has lost its ability to control the use of its copyrighted works.

86.     Given Defendants' blatant willingness to copy Dan Dee's copyrighted works and openly flaunt the intellectual property laws by attempting to distribute these works to Dan Dee's clients, unless enjoined by this Court, Defendants will continue to infringe upon Dan Dee's copyrights and otherwise profit from Dan Dee's copyrighted works.

87.     Accordingly, Dan Dee has suffered irreparable harm as a result of Defendants' conduct.  Dan Dee has no adequate remedy at law to redress the injuries that Defendants have caused and intend to cause by their conduct.  Dan Dee will continue to suffer irreparable damage until Defendants' actions alleged above are enjoined by this Court.

## V.     DAN DEE'S SKETCHES ARE COPYRIGHTED MATERIAL.

88.     The Easter Bunny Donut, Easter Fox, Easter Raccoon, Halloween Bunny Heavenly Soft, Halloween Masked Unicorn, Halloween Pumpkin Dog, and Halloween Witch Cat are original and creative.  As a result, they constitute copyrightable subject matter under the laws of the United States.

89.     Dan Dee is the owner of valid copyrights in the Easter Bunny Donut, Easter Fox, Easter Raccoon, Halloween Bunny Heavenly Soft, Halloween Masked Unicorn, Halloween Pumpkin Dog, and Halloween Witch Cat.  These copyrights were registered with the Copyright Office, and the Copyright Office issued valid certificates of registration therefor, as indicated in Exhibit J.

## VI.    THE INFORMATION TAKEN BY CAPOZZI AND LEE CONSTITUTES TRADE SECRETS

90.     The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836.

91.     A trade secret is defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3), that "is related to a product or service used in, or intended for use in, interstate or foreign commerce," 18 U.S.C. § 1836(b)(1).

92.     Dan Dee expended substantial resources and ingenuity creating, collecting, compiling, and protecting its proprietary information contained in: (i) the Valentine's Day Spreadsheet, including commercially-sensitive information comprising sample case identification numbers, program year, season, item descriptions, target factory costs, FOB Targets, and retail pricing; and (ii) the Dan Dee Slide Deck, including commercially-sensitive information about the retail pricing, customer selling unit price, store cost, total quantity, total quantity, dimensions, and projected sales volumes pertaining to specific combinations of stuffed animals and plush toys for each season.  This information also derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others. This is especially true in the stuffed animals and plush toys industry where profitability largely depends not only on the innovation and originality of the designs, but the unique insight and knowledge of the permutations and combinations of specific toys to promote for different seasons.

93.     Dan Dee expended substantial resources and ingenuity collecting, compiling, and protecting this confidential and proprietary information.  This information also derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others.  This is especially true in the stuffed animals and plush toys industry where profitability largely depends on the innovation and originality of the designs.

## COUNT I

### COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 101 *et seq.*)
### (AGAINST ALL DEFENDANTS)

94.     Dan Dee incorporates the preceding allegations as if fully set forth herein.

95.     The Easter Bunny Donut, Easter Fox, Easter Raccoon, Halloween Bunny Heavenly Soft, Halloween Masked Unicorn, Halloween Pumpkin Dog, and Halloween Witch Cat are

original and creative.  As a result, they constitute copyrightable subject matter under the laws of the United States.

96.     Dan Dee is the owner of valid copyrights in the Easter Bunny Donut, Easter Fox, Easter Raccoon, Halloween Bunny Heavenly Soft, Halloween Masked Unicorn, Halloween Pumpkin Dog, and Halloween Witch Cat.  These copyrights were registered with the Copyright Office, and the Copyright Office issued valid certificates of registration therefor, as indicated in Exhibit J.

97.     By their actions, alleged above, including misappropriating Dan Dee's copyrights and sending the same to GNV, with intent for the subsequent manufacture of stuffed animals and plush toys based on Dan Dee's copyrights, Defendants have infringed and will continue to infringe Dan Dee's copyrights in and to the Easter Bunny Donut, Easter Fox, Easter Raccoon, Halloween Bunny Heavenly Soft, Halloween Masked Unicorn, Halloween Pumpkin Dog, and Halloween Witch Cat by reproducing, distributing, and developing substantially similar works and/or derivative works, without any authorization or permission from Dan Dee.

98.     Defendants' direct infringement of Dan Dee's copyrights is deliberate, willful, and in utter disregard for Dan Dee's rights.

99.     Upon information and belief, as a direct and proximate result of their wrongful conduct, Defendants have obtained benefits, including, without limitation, profits to which Defendants are not entitled.

100.     As a direct and proximate result of Defendants' wrongful conduct, Dan Dee will be substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, Defendants will cause further irreparable injury to Dan Dee.

101.    Dan Dee is entitled to injunctive relief enjoining Defendants, their agents, and employees, and all persons acting in concert or participation with them, from infringing Dan Dee's copyrighted works.

102.    Dan Dee is further entitled to recover from Defendants the damages, including attorneys' fees and costs, it has sustained and will sustain, and any gains, profits, and advantages obtained by Defendants as a result of their acts of infringement as alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Dan Dee, but will be established according to proof at trial.

## COUNT II

### FEDERAL DEFEND TRADE SECRETS ACT
### (AGAINST ALL DEFENDANTS)

103.    Dan Dee incorporates the preceding allegations as if fully set forth herein.

104.    The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836.

105.    Under the DTSA, "trade secret" means:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

106.    Under the DTSA, "misappropriation" means:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

107.     Under the DTSA, "'improper means'. . . (A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

108.     By engaging in the above conduct, Capozzi, Lee, and GNV have misappropriated Dan Dee's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce in violation of the DTSA.

109.     In particular, Capozzi and Lee have emailed to their personal email addresses commercially-sensitive information comprising sample case identification numbers, program year, season, item descriptions, target factory costs, FOB Targets, and retail pricing.

110.     This information is used in connection with Dan Dee's supply of merchandise to its retailers throughout the country.

111.     Dan Dee expended substantial resources, effort, and expertise collecting, compiling, and protecting this confidential and proprietary information.  This information also

derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, others.

112.    Dan Dee has taken reasonable steps to maintain the confidential nature of this information including through confidentiality and non-disclosure provisions in the Employment Agreements.

113.    Capozzi and Lee are subject to the provisions designed to protect Dan Dee's proprietary and confidential information through their Employment Agreements, which required that they maintain the confidentiality of Dan Dee's information and prohibited them from using such information other than as necessary in the course of performing their duties for Dan Dee.

114.    Capozzi and Lee had no right to retain or use any of Dan Dee's trade secrets or other confidential and proprietary information after resigning from Dan Dee.  At no point did Dan Dee give Lee or Capozzi permission to download or take Dan Dee's confidential information and trade secrets.  Capozzi and Lee knew or should have known that the information they retained upon their departure contained trade secrets belonging to Dan Dee.

115.    GNV directed, participated in, and/or benefited from the misappropriation of Dan Dee's confidential information.  GNV knew, or ought to have known, that the confidential information it received from Capozzi and/or Lee constituted trade secrets of Dan Dee, which had been misappropriated by Capozzi and/or Lee.  Upon information and belief, Dan Dee's confidential information is now in GNV's possession and on GNV's systems, and Defendants are retaining the misappropriated information to compete with and otherwise harm Dan Dee.

116.    Defendants can obtain economic value for the disclosure and use of Dan Dee's trade secrets, for example, by avoiding the years, and substantial investment, that it took Dan Dee

to develop the trade secrets, and to utilize Dan Dee's long-standing relationship with Walmart, Meijer, and other retailers for GNV's own financial gain.

117.    As a consequence of the foregoing, Dan Dee has suffered and will continue to suffer irreparable harm, injury, and loss that cannot be remedied through monetary damages.  Unless enjoined, Defendants will continue to use Dan Dee's trade secret information to unfairly compete and Dan Dee will continue to suffer irreparable harm.

118.    Pursuant to the DTSA, actual or threatened misappropriation of trade secrets may be enjoined.

119.    As a direct and proximate result of Defendants' willful and malicious conduct, Dan Dee has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

## COUNT III

## BREACH OF CONTRACT
### (AGAINST DEFENDANTS CAPOZZI AND LEE)

120.    Dan Dee incorporates the preceding allegations as if fully set forth herein.

121.    The Employment Agreements are valid contracts between Dan Dee and Capozzi and Lee.  *See* Ex. A-B.

122.    In their respective Agreements, Capozzi and Lee agreed to not disclose Confidential Information, including about Dan Dee's drawings, sketches, specifications, and designs.  The Employment Agreements further require Capozzi and Lee to return all Confidential Information to Dan Dee upon termination of their employment and prohibit Capozzi and Lee from sharing the Confidential Information.  The Separation Agreements also require Capozzi and Lee to return all Confidential Information to Dan Dee upon termination of their employment.

123.     Capozzi and Lee also agreed to refrain from interfering with Dan Dee's relationships with its customers, namely Walmart and Meijer.

124.     Dan Dee performed all of its duties and obligations under the Employment Agreements.

125.     As set forth above, Capozzi and Lee breached (and threaten to breach) their respective Employment Agreements by, among other things, (1) using and disclosing Dan Dee's Confidential Information; (2) removing Confidential Information from Dan Dee; (3) soliciting and inducing Dan Dee's customers, namely Walmart and Meijer, to purchase GNV merchandise with designs that were misappropriated from Dan Dee; and (4) competing with Dan Dee by consulting with GNV during their employment with Dan Dee.

126.     As a direct and proximate result of the above-referenced breaches, among others known and to be discovered, Dan Dee suffers and continues to suffer damages, including, but not limited to, lost business, lost profits, and damage to goodwill.

### COUNT IV

### UNFAIR COMPETITION
### (AGAINST GNV)

127.     Dan Dee incorporates the preceding allegations as if fully set forth herein.

128.     Dan Dee's confidential information, employee relationships, and customer goodwill and relationships are the result of Dan Dee's skill, expenditures, and labor.

129.     GNV misappropriated Dan Dee's confidential information, employee relationships, and customer goodwill and relationships when it induced, permitted, and encouraged Capozzi and Lee's breaches of their respective Employment Agreements.

130.     GNV misappropriated Dan Dee's confidential information, employee relationships, and customer goodwill and relationships to gain a commercial advantage over Dan Dee.

131.    GNV directed, participated, and/or benefited from the misappropriation of Dan Dee's confidential information, including but not limited to, causing Capozzi and Lee to FedEx stuffed animals and plush toys to GNV to assist GNV with the design of its own merchandise, while Capozzi and Lee were still employed at Dan Dee, to the benefit of GNV and to the detriment of Dan Dee.  Upon information and belief, Dan Dee's confidential information is now in GNV's possession and on GNV's systems and GNV is retaining the misappropriated information to compete with and otherwise harm Dan Dee.

132.    As a result of GNV's conduct, Dan Dee suffered and will continue to suffer irreparable harm.  Injunctive relief is necessary as Dan Dee is without an adequate remedy of law to prevent this harm to Dan Dee.

133.    As a direct and proximate result of this conduct, Dan Dee has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Dan Dee respectfully requests that the Court enter judgment against Defendants and award the following relief:

a.    Declaration that Defendants directly infringed Dan Dee's copyrights;

b.    Judgment for Dan Dee against Defendants for all damages suffered by Dan Dee, including any profits or gain by Defendants in the United States that is attributable to the infringement of Dan Dee's copyrights in amounts to be determined at trial;

c.    A preliminary injunction, enjoining and restraining (a) Capozzi and Lee, and anyone acting in concert with them, including GNV, from violating, or participating in the violation of, any of the terms of their respective Employment Agreements;

(b) GNV, and anyone acting in concert with it, from interfering with either Capozzi's or Lee's Employment Agreements with Dan Dee; (c) GNV, and anyone acting in concert with it, including but not limited to Capozzi and Lee, from contacting, soliciting, or servicing any customer, prospective customer, or referral source about whom Capozzi and Lee possessed or learned confidential information about while employed at Dan Dee, including but not limited to any person listed on any document misappropriated by Capozzi and Lee from Dan Dee; (d) Defendants, and anyone acting in concert with Defendants, from using, divulging, disclosing, or misusing any Dan Dee Confidential Information (as defined by the Employment Agreements) and trade secrets; and (e) Defendants, their subsidiaries, affiliates, officers, agents, representatives, servants, employees, and attorneys; and all persons acting in concert or participation with them from directly infringing Dan Dee's copyrights, including by reproducing, distributing, publicly displaying, or creating derivative works from Dan Dee's copyrighted works;

d.   An Order granting permanent injunctive relief in accord with Paragraph (c) above, and as separately may be requested at a preliminary injunction hearing and any trial;

e.   An Order requiring Defendants to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between Capozzi and Lee (or any of the other Dan Dee employees that joined GNV); between and among GNV, Capozzi, and Lee (or any of the other Dan Dee employees that joined GNV); between

Defendants and any Dan Dee employee; and between Defendants and any Dan Dee customer, prospective customer, or referral source;

f.      An Order requiring the following, at Capozzi and Lee's expense: (a) a forensic inspection of all of Capozzi's and Lee's personal devices, email accounts, and cloud storage accounts ("devices/accounts"), and any devices/accounts used by Capozzi and Lee at GNV, in order to identify Dan Dee Confidential Information (as defined by the Employment Agreements) and trade secrets; (b) GNV to search its corporate systems (including email systems, networks, shared drives, cloud storage, etc.) to identify Dan Dee property, Confidential Information (as defined by the Employment Agreements), trade secrets, and copyrighted works; (c) GNV to take remedial action to purge all such Dan Dee property, Confidential Information, trade secrets, and copyrighted works from the above-referenced systems; and (d) Defendants to return all such Dan Dee property, Confidential Information, trade secrets, and copyrighted works to Dan Dee;

g.      An Order awarding Dan Dee its actual and exemplary damages, in an amount to be determined at trial;

h.      An Order awarding Dan Dee its pre- and post-judgment interest as allowed by law as well as its attorneys' fees and costs of this action; and

i.      An Order awarding any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable in this action.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Michael J. Flynn
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs Dan Dee International,*
*LLC, DanDee Hong Kong Holdings Limited,*
*and Dan Dee International Holdings, Inc.*

OF COUNSEL:

John Del Monaco
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

November 8, 2023